Nos. 20-1001(L), 20-1023

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

BONNIE PELTIER, *et al.*,

Plaintiffs-Appellees/Cross-Appellants

v.

CHARTER DAY SCHOOL, INC., *et al.*,

Defendants-Appellants/Cross-Appellees

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

———————————

REHEARING EN BANC BRIEF FOR THE UNITED STATES AS AMICUS
CURIAE SUPPORTING PLAINTIFFS-APPELLEES/CROSS-APPELLANTS
AND URGING AFFIRMANCE ON THE ISSUE ADDRESSED HEREIN

———————————

KRISTEN CLARKE
  Assistant Attorney General

THOMAS E. CHANDLER
JASON LEE
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-1915

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................................ 1

STATEMENT OF THE ISSUE ............................................................................. 2

STATEMENT OF THE CASE ............................................................................... 2

    1.    *Background* ........................................................................... 2

        *a.*    *Charter Schools Under North Carolina Law* ........................... 2

        *b.*    *The School's Dress Code* ..................................................... 3

    2.    *Procedural History* ................................................................. 5

        *a.*    *District Court Proceedings* ........................................................ 5

        *b.*    *Appellate Proceedings* ............................................................. 7

SUMMARY OF ARGUMENT ............................................................................. 9

ARGUMENT

    CDS'S IMPLEMENTATION AND ENFORCEMENT OF ITS
    DRESS CODE CONSTITUTES STATE ACTION UNDER THE
    EQUAL PROTECTION CLAUSE ........................................................... 10

    A.    *State Action Depends On The Particular Relationship
        Between A Private Entity And The State* ............................................ 10

    B.    *CDS Fulfills Part Of North Carolina's Obligation Under
        Its State Constitution To Provide A Free Public Education* ............... 12

    C.    *In Providing A Free Education, CDS Also Performs An
        Activity That Traditionally Has Been The Exclusive
        Prerogative Of The State* ...................................................................... 17

**TABLE OF CONTENTS (continued):**                    **PAGE**

D.    *North Carolina Is Pervasively Entwined With CDS's Operations* .......................................................................... 21

E.    *The Record Contains Other Indicia Of State Action* .......................... 24

F.    *Defendants' Admission That The Dress Code Constitutes A Key Part Of The School's Educational Model Confirms That CDS Is A State Actor For Purposes Of The Equal Protection Clause Claim Here* .......................................................... 26

CONCLUSION ..................................................................... 29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                                                    **PAGE**

*Andrews* v. *Federal Home Loan Bank of Atlanta*,
    998 F.2d 214 (4th Cir. 1993) ................................................................. 18, 20

*Blum* v. *Yaretsky*, 457 U.S. 991 (1982) ........................................................ 11, 26

*Brent* v. *Wayne Cnty. Dep't of Human Servs.*,
    901 F.3d 656 (6th Cir. 2018),
    cert. denied, 139 S. Ct. 1551 (2019)............................................................13

*Brentwood Acad.* v. *Tennessee Secondary Sch. Athletic Ass'n*,
    531 U.S. 288 (2001)............................................................ 10-11, 21, 23, 26

*Bridges* v. *City of Charlotte*, 20 S.E.2d 825 (N.C. 1942)........................................13

*Caviness* v. *Horizon Cmty. Learning Ctr., Inc.*,
    590 F.3d 806 (9th Cir. 2010) ................................................................. 26-28

*Chevron U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984).......................................................................................7

*DeBauche* v. *Trani*, 191 F.3d 499 (4th Cir. 1999),
    cert. denied, 529 U.S. 1033 (2000)................................................................18

*Flagg Bros., Inc.* v. *Brooks*, 436 U.S. 149 (1978) ................................................19

*Goldstein* v. *Chestnut Ridge Volunteer Fire Co.*,
    218 F.3d 337 (4th Cir. 2000), cert. denied, 531 U.S. 1126,
    and 531 U.S. 1152 (2001).......................................................... 11, 18, 24-25

*Hayden* v. *Greenberg Cmty. Sch. Corp.*,
    743 F.3d 569 (7th Cir. 2014) ........................................................................6

*Jackson* v. *Metropolitan Edison Co.*, 419 U.S. 345 (1974)............................... 12, 17

**CASES (continued):** PAGE

*Lee* v. *Katz*, 276 F.3d 550 (9th Cir.), cert. denied, 536 U.S. 905 (2002)................26

*Logiodice* v. *Trustees of Maine Cent. Inst.*, 296 F.3d 22 (1st Cir. 2002),
 cert. denied, 537 U.S. 1107 (2003).................................................... 16, 20, 23

*Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922 (1982) ...................................... 7, 10-11

*Manhattan Cmty. Access Corp.* v. *Halleck*, 139 S. Ct. 1921 (2019) ............... 12, 17

*Mentavlos* v. *Anderson*, 249 F.3d 301 (4th Cir.),
 cert. denied, 534 U.S. 952 (2001)........................................................... 11, 21

*Peltier* v. *Charter Day Sch., Inc.*, 8 F.4th 251 (4th Cir. 2021)............................ 7-9

*Polk Cnty.* v. *Dodson*, 454 U.S. 312 (1981) ...................................................... 11, 14

*Rendell-Baker* v. *Kohn*, 457 U.S. 830 (1982).................................................. *passim*

*Rowan Cnty. Bd. of Educ.* v. *United States Gypsum Co.*,
 418 S.E.2d 648 (N.C. 1992) .................................................................... 19-20

*Silver* v. *Halifax Cnty. Bd. of Comm'rs*, 821 S.E.2d 755 (N.C. 2018)....................19

*Sneed* v. *Greensboro City Bd. of Educ.*, 264 S.E.2d 106 (N.C. 1980) ....................19

*State* v. *Kinston Charter Acad.*, 836 S.E.2d 330
 (N.C. Ct. App. 2019), cert. granted, 847 S.E.2d 412,
 847 S.E.2d 413, and 847 S.E.2d 421 (N.C. 2020)............................ 14, 19, 25

*United Auto Workers, Loc. No. 5285* v. *Gaston Festivals, Inc.*,
 43 F.3d 902 (4th Cir. 1995) ............................................................... 18-19, 21

*United States* v. *Classic*, 313 U.S. 299 (1941) .......................................................13

*West* v. *Atkins*, 487 U.S. 42 (1988).................................................................. *passim*

**FEDERAL STATUTES:**                                    **PAGE**

Civil Rights Act of 1964,
    42 U.S.C. 2000h-2 ................................................................1

20 U.S.C. 1681 ........................................................................5

42 U.S.C. 1983 ........................................................................7

42 U.S.C. 2000c-6 ...................................................................2

**STATE CONSTITUTIONS:**

N.C. Const. Art. I ................................................................. 13

N.C. Const. Art. IX ..................................................... *passim*

**STATE STATUTES:**

N.C. Gen. Stat. § 115C-218 (2017) ........................................16

N.C. Gen. Stat. § 115C-218(a) (2017) ................................2, 17

N.C. Gen. Stat. § 115C-218.5 (2016) .....................................22

N.C. Gen. Stat. § 115C-218.6(a) (2016) .................................17

N.C. Gen. Stat. § 115C-218.15(a) (2016) ........................ *passim*

N.C. Gen. Stat. § 115C-218.15(b) (2016) .................................2

N.C. Gen. Stat. § 115C-218.20(a) (2017) ........................ 23, 26

N.C. Gen. Stat. §§ 115C-218.45(a)-(h) (2020) ........................22

N.C. Gen. Stat. § 115C-218.85(a)(2) (2019) ..................... 17, 22

N.C. Gen. Stat. § 115C-218.90(a)(4) (2017) .................... 23-24

N.C. Gen. Stat. § 115C-218.95(a) (2016) ........................ 23-24

**STATE STATUTES (continued):**     **PAGE**

N.C. Gen. Stat. § 115C-551 (2020) ...........................................................17

1839 N.C. Sess. Laws, c. 8 ......................................................................19

**REGULATION:**

47 Fed. Reg. 32,526 (July 28, 1982).........................................................7

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

Nos. 20-1001(L), 20-1023

BONNIE PELTIER, *et al.*,

Plaintiffs-Appellees/Cross-Appellants

v.

CHARTER DAY SCHOOL, INC., *et al.*,

Defendants-Appellants/Cross-Appellees

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

————————————

REHEARING EN BANC BRIEF FOR THE UNITED STATES AS AMICUS
CURIAE SUPPORTING PLAINTIFFS-APPELLEES/CROSS-APPELLANTS
AND URGING AFFIRMANCE ON THE ISSUE ADDRESSED HEREIN

————————————

**INTEREST OF THE UNITED STATES**

The Fourteenth Amendment's Equal Protection Clause applies to acts of the

States, not to acts of private persons or entities.  But in some circumstances, the

actions of a private person or entity will be considered state action.  The United

States has a substantial interest in how state action is analyzed in the context of

public education.  Title IX of the Civil Rights Act of 1964 vests the Attorney

General with the authority to intervene in cases "seeking relief from the denial of

equal protection of the laws."  42 U.S.C. 2000h-2.  The Attorney General also has

- 2 -

significant responsibility regarding enforcement of the Equal Protection Clause in public education under Title IV of the Civil Rights Act of 1964.  See 42 U.S.C. 2000c-6.

## STATEMENT OF THE ISSUE

Whether the operator of a charter school, authorized by the State to provide educational alternatives for students in its public school system, is a state actor for purposes of the Equal Protection Clause of the Fourteenth Amendment when it adopts a dress code that forms a "key part" of the school's educational model.

## STATEMENT OF THE CASE

1. *Background*

    a. *Charter Schools Under North Carolina Law*

The North Carolina Constitution requires the State to provide "a general and uniform system of free public schools."  N.C. Const. Art. IX, § 2, Cl. 1.  North Carolina's Charter School Act authorizes the State to issue charters (*i.e.*, contracts) that permit private entities to run schools that "operate independently of existing schools."  N.C. Gen. Stat. § 115C-218(a) (2017).  Although a charter school is "operated by a private nonprofit corporation," it nonetheless constitutes "a public school within the local school administrative unit in which it is located."  N.C. Gen. Stat. § 115C-218.15(a) and (b) (2016).  As such, it is accountable to the North

- 3 -

Carolina State Board of Education "for ensuring compliance with applicable laws and the provisions of [its] charter[]."  N.C. Gen. Stat. § 115C-218.15(a).

b.    *The School's Dress Code*

In August 1999, defendant-appellant/cross-appellee Charter Day School, Inc. (CDS) applied for a charter from the State Board of Education to operate a public school.  J.A. 106-211.[1]  As CDS explained in its charter application, the school would "emphasize[] traditional values" and serve "students who wish to fulfill high expectations for * * * discipline."  J.A. 108.  CDS listed a number of "unique features" of the proposed school, including use of a "[d]irect [i]nstruction teaching method[]" and adoption of a "uniform dress code."  J.A. 111.  CDS suggested that the dress code would "help to instill discipline and keep order."  J.A. 114.

The State Board of Education approved CDS's application and granted a charter that permitted the school to open for the 2000-2001 school year.  J.A. 2716.  The charter was renewed in 2005 and 2015.  J.A. 2716.  CDS's current charter emphasizes its obligation to operate a school that is "accessible to all North Carolina students eligible to attend public schools."  J.A. 213.

As promised in CDS's charter application, the school has had some form of dress code since its founding.  J.A. 1538.  The current dress code contains certain

---

[1] "J.A. ___ " refers to page numbers in the Joint Appendix.

- 4 -

requirements that apply to all students and other requirements that apply only to male or female students.  J.A. 1540-1541.  As relevant here, one sex-specific component of the dress code requires female students to wear skirts, skorts, or jumpers to school and forbids them from wearing pants or shorts, subject to certain exceptions.  J.A. 1540.[2]

The dress code has been "a key part" of CDS's "overall pedagogical strategy."  Appellants' Br. 10; see also Resp. to Pet. for Reh'g En Banc 1-2 (including the school's "traditional dress code" as a component of its "educational model").  As one member of CDS's Board of Trustees stated, the dress code "is part of the [school's] discipline in the classroom" and "part of the [school's] education, which is direct instruction."  J.A. 1602.  It is intended to help ensure that these aspects of CDS's pedagogical approach "work seamlessly together in a coordinated fashion" to create "a disciplined environment" that improves "educational attainment."  J.A. 1602.  Other CDS and school officials concur in this view.  See, *e.g.*, J.A. 1611 (explaining that student learning at the school "is helped by having a uniform policy"); J.A. 1763 (describing the understanding among CDS's Board of Trustees that the school would have a dress code because such policies "promote discipline and better behavior").

---

[2]  A "skort[]" is a skirt that has a pair of shorts attached underneath.  J.A. 40 (citation omitted).  A "jumper[]" is a sleeveless dress worn over a blouse.  J.A. 40 (citation omitted).

- 5 -

2.    *Procedural History*

a.    *District Court Proceedings*

Plaintiffs-Appellees/Cross-Appellants (plaintiffs) are guardians ad litem for female students currently or previously enrolled at the school.  J.A. 320-321.  They brought suit in the Eastern District of North Carolina against CDS, members of CDS's Board of Trustees, and the Roger Bacon Academy, Inc., a for-profit corporation that manages the day-to-day operations of the school (collectively, defendants).  J.A. 2715-2717.  In their Amended Complaint, plaintiffs allege that the dress code's requirement that female students wear skirts, skorts, or jumpers, and not shorts or pants, "restricts [their] physical activity, distracts from their learning, and limits their educational opportunities."  J.A. 2713-2714.  They further allege that the requirement "sends a message that their comfort and freedom to engage in physical activity are less important than those of their male classmates." J.A. 2720.  As relevant here, plaintiffs allege that the dress code violates the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education Amendments Act of 1972, 20 U.S.C. 1681 *et seq.*  J.A. 55-58.

The parties cross-moved for summary judgment and the district court granted and denied both motions in part.  J.A. 2711-2746.  First, the court ruled in favor of plaintiffs on their Equal Protection Clause claim.  J.A. 2743.  On the threshold issue of whether CDS's promulgation and enforcement of the dress code

- 6 -

constitutes state action, the court held that it did for three reasons:  (1) charter schools are "deemed public schools" under North Carolina law; (2) CDS adopted the dress code while fulfilling the "historical, exclusive and traditional state function" of providing "free, public education"; and (3) North Carolina "extensively regulates portions of charter school operations."  J.A. 2731-2734. The court found that, "under the facts and circumstances presented here," the challenged conduct constituted state action for purposes of the Equal Protection Clause.  J.A. 2736.  The court cautioned, however, that this finding "d[id] not equate to a finding that North Carolina charter schools and their board members are state actors for all purposes"; rather, "only that the action complained of here occurred under color of state law."  J.A. 2736.

Next, having found state action, the district court concluded that the dress code violates the Equal Protection Clause.  J.A. 2738-2744.  The court acknowledged the parties' disagreement over the applicable standard—plaintiffs urged the court to apply intermediate scrutiny and defendants urged the court to use the Seventh Circuit's "comparable burdens" analysis from *Hayden* v. *Greenberg Community School Corp*., 743 F.3d 569 (7th Cir. 2014).  J.A. 2739-2740 (quoting *Hayden*, 743 F.3d at 581).  The court declined to resolve the issue because, in its view, summary judgment in favor of plaintiffs was warranted even under *Hayden*.  See J.A. 2740-2743.

- 7 -

Finally, the district court ruled in favor of defendants on plaintiffs' Title IX claim.  J.A. 2727.  Citing the Department of Education's (ED) rescission in 1982 of a Title IX regulation that had prohibited discrimination in personal-appearance codes, see 47 Fed. Reg. 32,526 (July 28, 1982), the court reasoned that ED interprets Title IX as inapplicable to school dress codes.  J.A. 2724-2726.  The court deferred to this agency "interpretation" under *Chevron U.S.A., Inc.* v. *Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984), and entered summary judgment on plaintiffs' Title IX claim in favor of defendants.  J.A. 2726-2727.

b.      *Appellate Proceedings*

The parties cross-appealed the district court's summary-judgment ruling and a divided panel of this Court reversed as to both claims.  On plaintiffs' Equal Protection Clause claim, the panel majority held that CDS's adoption and enforcement of the dress code did not constitute state action, finding that such conduct was "not 'fairly attributable' to the state for § 1983 purposes." *Peltier* v. *Charter Day Sch., Inc.*, 8 F.4th 251, 263 (4th Cir. 2021) (quoting *Rendell-Baker* v. *Kohn*, 457 U.S. 830, 838 (1982)).[3]  In reaching this conclusion, the majority found that (1) CDS does not perform a traditionally exclusive state function; (2) CDS

---

[3]  The requirement of action that occurred "under color of law" for purposes of 42 U.S.C. 1983 is "identical" to the requirement of state action under the Fourteenth Amendment.  *Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922, 928 (1982) (internal quotation marks and citation omitted).

- 8 -

does not fulfill a constitutional obligation that North Carolina has delegated to it;
(3) state law had not compelled CDS to adopt the challenged portions of the dress
code, and (4) the State is not pervasively entwined with CDS. *Id.* at 264-267.

On the Title IX claim, the panel majority held that the text of Title IX
"plainly" encompasses school dress codes. *Peltier*, 8 F.4th at 271. Explaining that
Title IX's "sweeping prohibition" against sex discrimination includes no exception
for dress codes, the panel majority concluded that such codes "should be
considered just like than [sic] any other activity under Title IX's purview." *Id.* at
271-272. The panel majority then addressed the application of Title IX to the dress
code here, concluding that the statute requires "an individualized analysis" of
whether the challenged portions of the code exclude students from participation in,
deny them the benefits of, or treat them worse than similarly situated students in a
program or activity covered by Title IX. *Id.* at 273. The panel majority remanded
the claim to the district court for evaluation of "whether there are genuine issues of
material fact as to each of these three theories." *Ibid.*

Judge Keenan concurred in part and dissented in part. *Peltier*, 8 F.4th at
274-281. She concluded that, given North Carolina's designation of charter
schools as "public" and the "near-total governmental funding flowing to CDS,"
CDS's adoption of the dress code was fairly attributable to the State. *Id.* at 277.
On the Title IX claim, Judge Keenan concurred in the portion of the panel

- 9 -

majority's opinion holding that the statute applies to school dress codes and remanding for further proceedings.  *Id.* at 275.

On October 19, 2021, this Court granted rehearing en banc.  See *Peltier* v. *Charter Day Sch., Inc.*, No. 20-1001(L), 2021 WL 4892153, at *1 (4th Cir. Oct. 19, 2021).

## SUMMARY OF ARGUMENT

The district court correctly concluded that CDS's adoption and enforcement of the dress code challenged here represents state action for purposes of plaintiffs' Equal Protection Clause claim.  The Supreme Court has identified a number of circumstances in which private individuals and entities typically will be found to have engaged in state action.  Three of those circumstances apply here.  First and foremost, in providing a free public education, CDS fulfills an obligation that North Carolina bears under its state constitution, but which it has delegated in part to CDS.  Second, that function of providing a free education also is an activity that traditionally has been exclusively performed by the State.  Third, CDS is a state actor based on North Carolina's pervasive entwinement with CDS's operations.  Additional indicia of state action also are apparent in the record and state law.  For example, CDS receives substantial state funding, is subject to extensive state regulation, is viewed under state law as an extension of the State itself, and may be covered by the State's sovereign immunity in certain circumstances.  Accordingly,

- 10 -

CDS's adoption and enforcement of the dress code—which forms, as defendants themselves describe, a key part of the pedagogical approach that CDS uses to provide a free public education—constitutes state action under the Equal Protection Clause.[4]

## ARGUMENT

### CDS'S IMPLEMENTATION AND ENFORCEMENT OF ITS DRESS CODE CONSTITUTES STATE ACTION UNDER THE EQUAL PROTECTION CLAUSE

A.    *State Action Depends On The Particular Relationship Between A Private Entity And The State*

The Fourteenth Amendment's Equal Protection Clause "applies to acts of the states, not to acts of private persons or entities." *Rendell-Baker* v. *Kohn*, 457 U.S. 830, 837 (1982). But in some circumstances, the actions of a private person or entity will be considered state action. The test is whether "the alleged infringement of federal rights [is] 'fairly attributable to the State.'" *Id.* at 838 (quoting *Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). Put differently, a plaintiff must show that a state is "*responsible* for the specific conduct of which the plaintiff complains." *Brentwood Acad.* v. *Tennessee Secondary Sch. Athletic*

---

[4]  The members of CDS's Board of Trustees constitute state actors for the same reasons CDS does. Indeed, neither plaintiffs nor defendants argue that members of the Board are subject to a different state-action analysis than CDS. See Appellants' Br. 18; Appellees' Br. 49. The United States takes no position on whether the Roger Bacon Academy is a state actor.

- 11 -

*Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Blum* v. *Yaretsky*, 457 U.S. 991, 1004 (1982)).

This analysis focuses on the "relationship" between the entity alleged to have engaged in unconstitutional conduct and the state. *West* v. *Atkins*, 487 U.S. 42, 51 (1988). For example, in *West*, the Supreme Court held that a private physician under contract to provide medical services at a state prison hospital was a state actor because his "function within the state system" was to fulfill the state's "affirmative obligation to provide adequate medical care" to inmates. *Id.* at 55-56. In contrast, in *Polk County* v. *Dodson*, 454 U.S. 312 (1981), the Court held that a public defender was *not* a state actor, despite his status as an actual government employee, because his function was to serve as "the State's adversary" during criminal proceedings. *Id*. at 322 n.13. Assessing the relationship between a private entity and a state is a "fact-bound" inquiry, *Mentavlos* v. *Anderson*, 249 F.3d 301, 311 (4th Cir.) (quoting *Lugar*, 457 U.S. at 939), cert. denied, 534 U.S. 952 (2001), and it requires consideration of "all the relevant circumstances," *Goldstein* v. *Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000), cert. denied, 531 U.S. 1126, and 531 U.S. 1152 (2001).

The Supreme Court's cases identify three circumstances in which a private entity typically will be deemed a state actor: (1) where a state bears an obligation under the federal or state constitution and has delegated the fulfillment of that

- 12 -

obligation to a private entity; (2) where the entity performs a function that traditionally has been performed exclusively by the state; and (3) where the State is pervasively entwined with the workings of a private entity.  All three of these scenarios are present here and militate in favor of finding state action.  Additional considerations on which this Court has relied in analyzing state action further support this conclusion.

B.    *CDS Fulfills Part Of North Carolina's Obligation Under Its State Constitution To Provide A Free Public Education*

1.  The Supreme Court has recognized "that a private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to a private entity."  *Manhattan Cmty. Access Corp.* v. *Halleck*, 139 S. Ct. 1921, 1929 n.1 (2019).  This is because the entity effectively exercises "power delegated to it by the State" in order to fulfill a legal "obligation" imposed on the State.  *Jackson* v. *Metropolitan Edison Co.*, 419 U.S. 345, 353 (1974).  For example, in *West*, "the State ha[d] a constitutional obligation, under the Eighth Amendment, to provide adequate medical care" to an inmate in a state prison.  487 U.S. at 54.  The State "fulfill[ed] th[at] obligation" by contracting with private physicians, including the respondent in that case.  *Id.* at 55.  Pointing to his "function within the state system," the Court held that the private physician was a state actor, as his treatment of inmates occurred while the physician was "clothed with the authority of state law."  *Ibid.*

- 13 -

(quoting *United States* v. *Classic*, 313 U.S. 299, 326 (1941)). Likewise, in *Brent* v. *Wayne County Department of Human Services*, 901 F.3d 656 (6th Cir. 2018), cert. denied, 139 S. Ct. 1551 (2019), the Sixth Circuit held that private facilities that provide care and treatment of court and state wards were state actors, citing the State's "constitutional[] require[ment] to protect children who are wards of the state" and its decision to "contract[] with [the facilities] to fulfill [that] dut[y]." *Id.* at 676-677.

CDS's operation of a public school pursuant to a charter involves a comparable delegation of North Carolina's obligation under its state constitution to provide a free public education. The North Carolina Constitution enshrines for state citizens "a right to the privilege of education" and explicitly makes it "the duty of the State to guard and maintain that right." N.C. Const. Art. I, § 15. The state constitution requires North Carolina to fulfill that duty by providing "a general and uniform system of free public schools." N.C. Const. Art. IX, § 2, Cl. 1. And the State Board of Education is tasked with "supervis[ing] and administer[ing]" that "free public school system." N.C. Const. Art. IX, § 5. The public school system provided by North Carolina thus "discharg[es]" a "special mandatory duty resting upon it under the [state] [c]onstitution." *Bridges* v. *City of Charlotte*, 20 S.E.2d 825, 830 (N.C. 1942); see also *ibid.* (noting that school

- 14 -

officials exercise "the immediate power of the State," which has been "direct[ly] delegat[ed]" to them).

Here, North Carolina delegated part of this constitutional duty to CDS by granting it a charter and permitting it to operate a school that is "accessible to all North Carolina students." J.A. 213. State law expressly designates charter schools as "public school[s]." N.C. Gen. Stat. § 115C-218.15(a) (2016). Charter schools thus share in North Carolina's performance of "a core constitutional function of the highest order" by providing the free public education that its state constitution demands. *State* v. *Kinston Charter Acad.*, 836 S.E.2d 330, 336 (N.C. Ct. App. 2019), cert. granted, 847 S.E.2d 412, 847 S.E.2d 413, and 847 S.E.2d 421 (N.C. 2020).

Consequently, CDS is a state actor for the same reasons the private physician in *West* was a state actor. In *West*, the State "bore an affirmative obligation to provide adequate medical care" to inmates in its custody. 487 U.S. at 56. The State "delegated that function" to a private physician, who "voluntarily assumed that obligation by contract." *Ibid.*; see also *id.* at 51 ("Institutional physicians assume an obligation to the mission [of providing health care in prisons] that the State, through the institution, attempts to achieve." (quoting *Polk Cnty.*, 454 U.S. at 320)). So, too, here, where CDS voluntarily assumed part of North Carolina's constitutional obligation to provide "a general and uniform

- 15 -

system of free public schools," N.C. Const. Art. IX, § 2, Cl. 1, by agreeing to operate a public school pursuant to a charter awarded by the State Board of Education.

2. Defendants dispute *West*'s applicability here, but none of their arguments is persuasive. First, defendants seek to limit *West* to situations where a state has "outsource[d] a historical and exclusive state obligation." Appellants' Resp. and Reply Br. 12. But *West* relied on the State's delegation of its "obligation  *  *  * to provide adequate medical care to those whom it has incarcerated" not because the obligation was historical and exclusive to the State, but rather, because the obligation applied to the State in its sovereign capacity "under the Eighth Amendment." 487 U.S. at 54; see also *id.* at 55 (noting that the need to provide medical care to inmates arose because of "the State's exercise of its right to punish [those inmates] by incarceration"). Accordingly, for this category of state action, there is no need to show that the function at issue has historically been performed exclusively by a state. But even if such a requirement applied, it would be satisfied here, as explained below. See pp. 17-20, *infra*.

Second, defendants attempt to distinguish *West* on the basis that the inmate there "was literally a prisoner of the state (and therefore a captive to whatever doctor the state provided)," while plaintiffs here "can avoid their alleged injury by attending a traditional public school or a different charter school." Appellants'

- 16 -

Resp. and Reply Br. 12 (quoting *Logiodice* v. *Trustees of Maine Cent. Inst.*, 296 F.3d 22, 29 (1st Cir. 2002), cert. denied, 537 U.S. 1107 (2003)).  But the ability of individuals to avoid exposing themselves to a state's activities does not determine whether state action is present.  For example, the plaintiff in *West* presumably could have avoided exposure to the private physician's medical treatment by not committing a crime in the first place.  The Supreme Court was clear in *West* that it was "the physician's *function* within the state system  *  *  *  that determine[d] whether his actions c[ould] fairly be attributed to the State."  487 U.S. at 55-56 (emphasis added).  That function was "to provide essential medical care to those the State had incarcerated," while "fully vested with state authority to fulfill essential aspects of the duty[] placed on the State by the Eighth Amendment and state law."  *Id.* at 56-57.

Third, defendants assert that North Carolina has not, in fact, "delegated [any of] its constitutional obligation" to provide a free public education to CDS because charter schools "operate independently" of "constitutionally mandated schools." Appellants' Resp. and Reply Br. 13 (quoting N.C. Gen. Stat. § 115C-218 (2017)). This is incorrect.  Charter schools constitute "public school[s] within the local school administrative unit in which [they] [are] located," N.C. Gen. Stat. § 115C-218.15(a), and they thus comprise part of the "free public school system" that the State Board of Education "supervise[s] and administer[s]."  N.C. Const. Art. IX, §

- 17 -

5.  Indeed, state law specifically requires the State Board to review the operations of charter schools to ensure they meet applicable "academic, financial, and governance standards."  N.C. Gen. Stat. § 115C-218.6(a) (2016).  CDS would be exempt from many of these standards if it operated a purely private school.  As just one example, charter schools are required to "meet the student performance standards adopted by the State Board of Education."  N.C. Gen. Stat. § 115C-218.85(a)(2) (2019).  Nonpublic schools are not.  See N.C. Gen. Stat. § 115C-551 (2020).

Accordingly, the charter school here comprises part of the "general and uniform system of free public schools" that North Carolina is required to provide under its state constitution, N.C. Const. Art. IX, § 2, Cl. 1, even if it may "operate independently" of other existing public schools, N.C. Gen. Stat. § 115C-218(a).  As the operator of such a charter school, CDS constitutes a state actor.

C.    *In Providing A Free Education, CDS Also Performs An Activity That Traditionally Has Been The Exclusive Prerogative Of The State*

1.  State action also may be found based on CDS's performance of a function that "has been 'traditionally the exclusive prerogative of the State.'"  *Rendell-Baker*, 457 U.S. at 842 (quoting *Jackson*, 419 U.S. at 353) (emphasis omitted); see also *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1929.  Although this category of state action bears strong similarities to the one discussed above, where a private entity has been delegated the obligation to fulfill a state's

- 18 -

constitutional duty, this Court has sometimes treated these as separate categories of state action.  See, *e.g.*, *Goldstein*, 218 F.3d at 342; *DeBauche* v. *Trani*, 191 F.3d 499, 507-508 (4th Cir. 1999), cert. denied, 529 U.S. 1033 (2000); *Andrews* v. *Federal Home Loan Bank of Atlanta*, 998 F.2d 214, 217 (4th Cir. 1993).

Activities that are "uniquely sovereign in character qualify as traditional and exclusive state functions."  *United Auto Workers, Loc. No. 5285* v. *Gaston Festivals, Inc.*, 43 F.3d 902, 907 (4th Cir. 1995).  Accordingly, in determining whether a private entity performs such a function, courts consider any "uniquely sovereign" activity in which the entity was engaged when it took the action being challenged.  *Ibid.*  For example, in holding that the suspension and termination of a firefighter by a volunteer fire department constituted state action, this Court in *Goldstein* relied on the fact that the "provision of fire protection services  *  *  * has been exclusively and traditionally the function of the government in Maryland."  218 F.3d at 344.  Similarly, in *United Auto Workers*, addressing a challenge to the denial of a booth at a "Fish Camp Jam" community festival organized by a private organization, this Court considered whether the "organization, management, and promotion of" such events "fall within the domain

- 19 -

of functions exercised traditionally and exclusively by the government." 43 F.3d
at 907-908.

Here, the uniquely sovereign activity in which CDS engages is the provision
of a free education to North Carolina students, see pp. 14-15, *supra*, and state case
law confirms that this is a function that traditionally has been "reserved to the
State." *Kinston Charter Acad.*, 836 S.E.2d at 337; see also *Silver* v. *Halifax Cnty.
Bd. of Comm'rs*, 821 S.E.2d 755, 756 (N.C. 2018) (acknowledging that "the State
* * * is solely responsible for guarding and preserving the right of every child in
North Carolina to receive a sound basic education"). Cf. *Flagg Bros., Inc.* v.
*Brooks*, 436 U.S. 149, 163 (1978) (noting that states have engaged in the
"function[] [of] education" with "a greater degree of exclusivity"). The very first
"statewide local option system of 'common' schools" was not the product of
private enterprise, but rather, arose out of North Carolina's School Law of 1839.
*Sneed* v. *Greensboro City Bd. of Educ.*, 264 S.E.2d 106, 111 (N.C. 1980) (quoting
1839 N.C. Sess. Laws, c. 8). "In one form or another, North Carolina has
maintained its system of 'free' public schools ever since 1840, with the exception
of the few years immediately after the Civil War." *Id.* at 111-112. And in Article
IX of its State Constitution adopted in 1868 (titled "Education"), North Carolina
enshrined its obligation to provide "a general and uniform system of free public
schools." See also *Rowan Cnty. Bd. of Educ.* v. *United States Gypsum Co.*, 418

- 20 -

S.E.2d 648, 655 (N.C. 1992) (noting that "[e]ducation is a governmental function so fundamental in this state that our constitution contains a separate article entitled 'Education'" (quoting N.C. Const. Art. IX)).  This case law and history demonstrate that CDS engages in state action by providing students a free education—activity that, as a matter of tradition, had been performed exclusively by the State of North Carolina.

2.  Defendants reach a different conclusion, but only by reformulating the question to ask whether "providing educational services" writ large has traditionally been a function that is exclusively performed by the State. Appellants' Br. 25; see also Appellants' Resp. and Reply Br. 8 ("Education has been provided by private entities and parents, as well as the state, for centuries."). In their view, focusing specifically on CDS's provision of a free education through public schools would improperly narrow the inquiry, representing a form of "tailoring by adjectives" that allegedly lacks support in Supreme Court case law. Appellants' Resp. and Reply Br. 10 (quoting *Logiodice*, 296 F.3d at 27).

Contrary to defendants' suggestion, assessing state action requires such specificity.  The analysis considers the particular conduct in which a private entity is engaged and asks whether that function is one that traditionally has been exclusively performed by the State.  See, *e.g.*, *Andrews*, 998 F.2d at 218-219 (considering whether "[t]he functions performed by the [alleged state actors]" are

"traditionally and exclusively public functions"). Accordingly, this Court in *Mentavlos* considered whether a public military college's use of "military-type training" to "educate civilian students" was a traditional and exclusive governmental function, given that "military training of enlisted soldiers" is traditionally an exclusive government function. 249 F.3d at 314, 316. *United Auto Workers* applied a similar focus on the particular type of activity in which the private entity was engaged, evaluating whether "[t]he organization, management, and promotion of events *such as the Fish Camp Jam * * * * fall within the domain of functions exercised traditionally and exclusively by the government." 43 F.3d at 907-908 (emphasis added).

Here, the *only* type of education that CDS is permitted to provide under its charter is a free education open to all students. See pp. 13-14, *supra*. The relevant inquiry, then, is whether that specific function has been traditionally and exclusively done by the State. And as explained above, it has.

D.    *North Carolina Is Pervasively Entwined With CDS's Operations*

1. More broadly, CDS also is a state actor due to North Carolina's pervasive entwinement with CDS's operations. The "nominally private character" of an entity can be "overborne by the pervasive entwinement of public institutions and public officials in its composition and workings." *Brentwood Acad.*, 531 U.S. at 298. Such entwinement is evident here given North Carolina's deep involvement

- 22 -

in how CDS runs its school, which is designated under state law as a "public school." N.C. Gen. Stat. § 115C-218.15(a). This classification is not a mere "label" (Appellants' Resp. and Reply Br. 14), but rather, informs the many ways North Carolina exerts control over charter schools' activities and operations.

As an initial matter, North Carolina wields full control over whether to agree to permit a charter school to open in the first place. See N.C. Gen. Stat. § 115C-218.5 (2016). Unlike private schools that exist independent of state authorization—including ones that contract with a state to educate some students—charter schools, like the one here, would not exist at all but for the State's decision to permit their operation. Cf. *Rendell-Baker*, 457 U.S. at 840-841 (considering a private school "not fundamentally different from many private corporations whose business depends primarily on [government] contracts").

North Carolina continues to be deeply involved in charter schools' operations after their creation. The State exercises control over the admission policies of charter schools, including their admission criteria, admission preferences, and enrollment processes. N.C. Gen. Stat. §§ 115C-218.45(a)-(h) (2020). Charter schools must "design" their educational programs to satisfy "the student performance standards adopted by the State Board of Education." N.C. Gen. Stat. § 115C-218.85(a)(2). The State Board also "provides funds to charter schools, approves the original members of the boards of directors of the charter

- 23 -

schools, has the authority to grant, supervise, and revoke charters, and demands full accountability from charter schools for school finances and student performance." N.C. Gen. Stat. § 115C-218.90(a)(4) (2017); see also N.C. Gen. Stat. § 115C-218.95(a) (2016) (listing reasons the State Board may terminate a charter). Additionally, the State Board oversees charter schools' "compliance with applicable laws and the provisions of their charters." N.C. Gen. Stat. § 115C-218.15(a). The State also is involved in charter schools' administrative and legal affairs. To offer just two examples, state law instructs that "employees of charter schools are public school employees," including for purposes of state-funded retirement and health plans, N.C. Gen. Stat. § 115C-218.90(a)(4), and the State Board of Education may require charter schools to obtain liability insurance of specific types and in specific amounts, N.C. Gen. Stat. § 115C-218.20(a) (2017). The State thus retains a significant role in and responsibility over the functioning of the school here.

2. Defendants assert that CDS is not sufficiently entwined with the State for two reasons: first, CDS has "a wholly private governing board," unlike in *Brentwood Academy*, and second, plaintiffs' claim pertains to a dress code, the contents of which are not set by any state law or regulation. Appellants' Resp. and Reply Br. 9, 11; see also *Logiodice*, 296 F.3d at 28 (assessing state entwinement in "the particular activity sought to be classed as state action"). But contrary to

defendants' suggestion, both of these bases confirm that CDS is a state actor. The
State Board of Education approved CDS's first Board of Trustees, N.C. Gen. Stat.
§ 115C-218.90(a)(4) (see also J.A. 118-122), and that Board adopted the school's
original dress code (see J.A. 1538 (noting that the school has always had a dress
code)). The State Board also approved CDS's charter application, which
specifically proposed the adoption of a dress code that would form a key part of the
school's educational model. J.A. 111. CDS's charter requires it to comply with
federal law (J.A. 214), and the State Board may terminate CDS's charter if it
believes that CDS is not doing so, see N.C. Gen. Stat. § 115C-218.95(a)(3)-(4).
Accordingly, the State has been entwined with both CDS's Board of Trustees and
the challenged dress code.

E.    *The Record Contains Other Indicia Of State Action*

The three theories of state action discussed above are not assessed in
isolation; rather, other evidence of state action should be considered. For example,
when concluding in *Goldstein* that a volunteer fire department was a state actor for
purposes of the plaintiff's challenge to his suspension and termination, this Court
not only relied on the fact that the department performed a function that
traditionally had been done exclusively by the State, but also examined "the
totality of the circumstances." 218 F.3d at 343-345. Among the other relevant
factors that supported the Court's conclusion were that the department (1) received

- 25 -

"substantial state funding"; (2) was subject to "extensive state regulation"; (3) was viewed by the State as a state actor; and (4) was "endowed" with protections typically "reserved to the State," like sovereign immunity. *Id.* at 339-340, 343-349.

These factors, considered collectively, militate in favor of finding state action here. First, CDS receives substantial state funding: on an annual basis, approximately 94.5% of the school's revenue comes from the State and local education agencies. See J.A. 2201 (breaking down revenue received in the fiscal year ending June 2015). Second, CDS is subject to extensive state regulation not imposed on traditional private schools. "The autonomy of charter schools in North Carolina is limited by regulatory and reporting requirements mandated by the General Assembly." *Kinston Charter Acad.*, 836 S.E.2d at 339-340. This includes adherence to "State-mandated health and safety standards, instructional guidelines, and admission requirements," satisfaction of "educational proficiency standards," and compliance with "regular financial auditing requirements." *Id.* at 340. Third, North Carolina law regards CDS as "an extension of the State itself" because "[c]harter schools, as public schools in the State of North Carolina, exercise the power of the State." *Id.* at 336. Finally, as a provider of free public education pursuant to a charter granted by the State Board of Education, CDS may be

- 26 -

covered by North Carolina's sovereign immunity, except where CDS would be "indemnifi[ed] by insurance." N.C. Gen. Stat. § 115C-218.20(a).

F.    *Defendants' Admission That The Dress Code Constitutes A Key Part Of The School's Educational Model Confirms That CDS Is A State Actor For Purposes Of The Equal Protection Clause Claim Here*

The foregoing analysis does not suggest that CDS is a state actor for all purposes. See *Caviness* v. *Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812-813 (9th Cir. 2010) (noting that "an entity may be a State actor for some purposes but not for others" (quoting *Lee* v. *Katz*, 276 F.3d 550, 555 n.5 (9th Cir.), cert. denied, 536 U.S. 905 (2002))). As discussed above, the underlying question when assessing state action is whether a state is "responsible for the *specific conduct* of which the plaintiff complains." *Brentwood Acad.*, 531 U.S. at 295 (quoting *Blum*, 457 U.S. at 1004) (emphasis omitted and added). Accordingly, in *Rendell-Baker*, the Supreme Court considered whether a private school "acted under color of state law when it discharged" six teachers. 457 U.S. at 831. Similarly, in *West*, the Court asked whether the physician's "delivery of medical treatment" amounted to state action. 487 U.S. at 57.

Here, at a minimum, CDS is a state actor for purposes of plaintiffs' Equal Protection Clause claim because, as defendants admit, the specific conduct being challenged (CDS's adoption and enforcement of the dress code) forms "a key part" of the "overall pedagogical strategy" CDS uses to provide a free public education.

- 27 -

Appellants' Br. 10; see also p. 4, *supra*.  Indeed, defendants specifically argued before the district court that "the uniform policy is part of the School's traditional values education, and that changing any of the specific requirements risks inadvertently changing the broader goal."  J.A. 2721.

Accordingly, based on defendants' own characterization of the dress code, it is integral to the way in which CDS fulfills the constitutional obligation that North Carolina has delegated to it, and how it performs a function that traditionally and exclusively has been performed by the State.  It also relates to a significant area of entwinement between CDS and the State.  This explicit connection between CDS's educational approach and the challenged dress code greatly simplifies the state-action analysis.  It also serves to distinguish this case from others where certain non-education-related employment decisions by school officials were found not to be state action.  See, *e.g.*, *Rendell-Baker*, 457 U.S. at 834-835 (considering terminations relating to "a dispute over the role of a student-staff council in making hiring decisions" and the discharge of another teacher); *Caviness*, 590 F.3d at 811 (evaluating claims involving alleged false statements by a school official and two employees that purportedly deprived a former teacher of a "liberty interest in

- 28 -

finding and obtaining work" and the denial of permission for the teacher to attend a high school track competition).

The factual record and case law thus support the conclusion that CDS is a state actor and subject to suit here under Section 1983. Indeed, a contrary conclusion could permit CDS and other charter schools in North Carolina to escape redress under Section 1983, even for actions that would blatantly violate the Equal Protection Clause if done by the State's traditional public schools. Regardless of whether plaintiffs prevail on their Equal Protection Clause claim in this case, a ruling that CDS is *not* a state actor could jeopardize charter school students' constitutional protections, depending on the specific safeguards contained in their schools' charter agreements with the State. See J.A. 214 (requiring CDS to comply with the Federal Constitution). There is no basis for reaching such conclusion here given the multiple, overlapping reasons for finding state action and the specific constitutional challenge at issue.[5]

---

[5] The United States takes no position on the merits of plaintiffs' Title IX or Equal Protection Clause claims. The United States did, however, recently address the threshold question of whether Title IX applies to school dress codes in its recent Statement of Interest in *Arnold* v. *Barbers Hill Independent School District*, No. 20-cv-01802 (S.D. Tex. July 23, 2021). As explained in that Statement of Interest (at 14 n.13), although ED rescinded in 1982 a Title IX regulation that had prohibited discrimination in the application of personal appearance codes, that rescission reflected ED's enforcement priorities and resource allocation at the time and has no impact on Title IX's scope. Indeed, since 1982, ED has investigated Title IX complaints involving dress and grooming codes. *Ibid.*

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's ruling that CDS and the members of CDS's Board of Trustees are state actors for purposes of plaintiffs' Equal Protection Clause claim.

Respectfully submitted,

KRISTEN CLARKE
 Assistant Attorney General

s/ Jason Lee
THOMAS E. CHANDLER
JASON LEE
 Attorneys
 U.S. Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 305-1915

# CERTIFICATE OF COMPLIANCE

I certify that the attached REHEARING EN BANC BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING PLAINTIFFS-APPELLEES/CROSS-APPELLANTS AND URGING AFFIRMANCE ON THE ISSUE ADDRESSED HEREIN:

(1) complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,496 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

(2) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point Times New Roman font.

s/ Jason Lee
JASON LEE
 Attorney

Date:  November 18, 2021